**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION**

| | | |
|---|---|---|
| **CORE COMMUNICATIONS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ZAYO BANDWITH NORTHEAST, LLC,** | ) | |
| **f/k/a, PPL TELCOM, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Core Communications, Inc. ("Core"), by its attorneys, hereby files its Complaint against Defendant Zayo Bandwith Northeast, LLC, formerly known as PPL Telcom, LLC ("PPL"), and states as follows:

**PARTIES**

1.      Plaintiff Core is a Washington, D.C. corporation with its principal place of business in Annapolis, Maryland.

2.      Defendant PPL is Delaware limited liability company with its principal place of business in Allentown, Pennsylvania.

3.      Upon information and belief, PPL is a subsidiary of Zayo Group, LLC, a Colorado limited liability company.

**JURISDICTION & VENUE**

4.      This court has jurisdiction pursuant to 28 U.S.C. § 1332. There is diversity of citizenship as between the Plaintiff and Defendant; and, as will be demonstrated herein, the amount in controversy exceeds $75,000.

1

5.      Venue is proper in this court pursuant to 28 U.S.C. § 1391 because the Defendant's corporate headquarters are located in this judicial district. Additionally, as will be demonstrated herein, venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## SUBSTANTIVE ALLEGATIONS

6.      Core and PPL are party to a Master Services Agreement ("MSA") dated December 14, 2004. A copy of the MSA, as it was first transmitted to Core for approval, is attached hereto as **Tab A.** Core does not currently have in its possession a copy of the final, signed MSA. However, upon information and belief, none of the MSA provisions referenced herein differs in any material way from the final, signed MSA.

7.      Pursuant to the MSA, PPL was to provide telecommunications services to Core on rates, terms and conditions set forth therein.

8.      Additional rates, terms and conditions applicable to specific PPL services are set forth in various Service Orders executed together with the MSA, or subsequent thereto.

9.      The MSA provides, *inter alia*, that:

3.1      Invoices.  Unless otherwise indicated in the applicable Service Order, PPLT will bill in advance charges for all Service to be provided during the ensuing month except for charges which are dependent upon usage of Service, which charges will be billed in arrears.  **PPLT will invoice CUSTOMER for all charges incurred by and credits due to CUSTOMER as set forth in the Service Order describing the specific Services ordered.**  Adjustments for the quantities of Service established or discontinued in any billing period during the Term will be pro-rated to the number of days based on a thirty (30) day month, if applicable. (Emphasis added).

3.4      Invoice Questions.  If CUSTOMER in good faith disputes any portion of any PPLT invoice, CUSTOMER will submit to PPLT, within thirty (30) days following the invoice date, full payment of the undisputed portion of the invoice and written documentation identifying and substantiating the disputed amount. If CUSTOMER does not report a dispute within thirty (30) days following the invoice date, CUSTOMER will have waived its right to dispute that invoice.

PPLT and CUSTOMER agree to use their respective best efforts to resolve any dispute within thirty (30) days after PPLT receives written notice of the dispute from CUSTOMER. Any disputed amounts resolved in favor of CUSTOMER will be credited to CUSTOMER'S account on the next invoice following resolution of the dispute. Any disputed amounts determined to be payable to PPLT will be due within ten (10) days of the resolution of the dispute. **Any dispute arising out of or relating to this Agreement, which has not been resolved by the good faith efforts of the parties, will be settled by binding arbitration conducted in accordance with this Agreement.** (Emphasis added).

8.10     Dispute Resolution.   **Any dispute which the Parties are unable to resolve within thirty (30) days written notice to the defaulting Party will be submitted to the American Arbitration Association for binding arbitration pursuant to the Commercial Arbitration Rules with proceedings conducted in Philadelphia, Pennsylvania.**   Notwithstanding any other section of this MSA **the non-breaching Party will be entitled to seek preliminary relief to preserve the status quo pending arbitration.**   Nothing stated herein will be construed to limit any other remedies available to the Parties.   The arbitrator will have the power to order specific performance if requested. Any award, order, or judgment pursuant to such arbitration will be deemed final and binding and may be enforced in any court of competent jurisdiction. (Emphasis added).

8.13     Governing Law.         **This MSA will be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania** without regard to its principles of choice of law. (Emphasis added).

10.     PPL provided services and billed Core since 2004. Core has disputed PPL's bills on four grounds:

- DS3 "Tail" Circuit between Harrisburg, PA and Parkersburg, WV. This circuit was originally provisioned and tested such that it appeared to be functioning and operational as ordered. However, subsequent investigation triggered by a third-party carrier showed that the circuit had been configured improperly and in fact, did not connect to the Parkersburg location whatsoever. When Core raised the issue with PPL, PPL reconfigured the circuit so that it functioned properly and as ordered. Nevertheless, PPL refuses to credit Core for charges accrued during the

period in which the circuit was misconfigured, and demands that Core immediately make payment in full for such charges.

- DS3 "Tail" Circuit between Harrisburg, PA and Harrisonburg, VA. This circuit was originally provisioned and tested such that it appeared to be functioning and operational as ordered. However, subsequent investigation showed that the circuit had been configured improperly. When Core raised the issue with PPL, PPL reconfigured the circuit so that it functioned properly and as ordered. Nevertheless, PPL refuses to credit Core for charges accrued during the period in which the circuit was misconfigured, and demands that Core immediately make payment in full for such charges.

- DS3 "Point-to-Point" Circuit between Chevy Chase, MD and Ashburn, VA. Core disconnected this circuit, but PPL claims it never received the notice of disconnection. PPL refuses to credit Core for charges accrued after the disconnection notice and demands that Core immediately make payment in full for such charges..

- "Eline 300M" Circuit between Baltimore, MD and Ashburn, VA. This circuit was billed for several months before it was actually placed in service. Nevertheless, PPL refuses to credit Core for charges accrued during the period in which the circuit was billed but never in service, and demands that Core make immediately payment in full for such charges.

- "Eline 600M" Circuit between Ashburn, VA and Baltimore, MD. Core downgraded this service to a lower grade, cheaper service. Yet, PPL continued to

bill Core at the higher rate, even as it provided the cheaper service, and demands that Core immediately make payment in full for such charges.

- "Eline 300M" Circuit between Harrisburg, PA and Philadelphia, PA. This circuit has experienced numerous and lengthy outages. Core has submitted credit requests, but PPL has declined to process such requests and demands that Core immediately make payment in full for such charges.

11.     Core submitted all of these disputes to PPL for its consideration, together with detailed descriptions and documentation of each dispute. The dispute summary spreadsheet and related documentation for each dispute, which Core previously transmitted to PPL, is attached hereto as **Tab B.** These disputes total $85,829.91, an amount which grows each month, as many of PPL's billing errors continue unabated and uncorrected.

12.     PPL rejected all of Core's disputes, primarily on the grounds that, because Core allegedly failed to raise the disputes in a timely fashion, all of the disputes are denied, regardless of their factual merit. PPL's February 17, 2014 letter rejecting Core's disputes, and demanding payment in the amount of $180,666.93, is attached hereto as **Tab C.** Zayo's letter threatens total service disruption if payment is not received on or before Monday, February 24, 2014.

13.     In 2006, Core ordered 600 Megabyte-per-second Ring Circuit Gigabyte Ethernet services between Ashburn, VA, Baltimore, MD, Harrisburg, PA and Philadelphia, PA. These ring-based services were ordered and provisioned on a "diverse" basis, meaning each link in the ring is routed over at least two separate, physical facilities. A copy of the network configuration that the parties agreed to in 2006 is attached hereto as **Tab D.** Upon information and belief, Core believes that PPL at some point, without any notice to Core, reconfigured these services so that there was no longer physical diversity, resulting in an inferior service that is subject to constant

interruption. Yet, PPL has continued to bill Core as if it was providing physically redundant service. Core estimates that PPL has billed and collected well in excess of $200,000 for physically redundant service that it never provided. Core does not now know the precise amount that was overbilled because it does not know when PPL reconfigured the service.

14.     Pursuant to the MSA, Core's disputes are subject to binding arbitration before AAA in Philadelphia, PA, if the parties are unable to resolve them in good faith.

14.     The parties are clearly unable to resolve the disputes on their own. Accordingly, Core filed a petition for arbitration and temporary restraining order with AAA in Philadelphia on February 20, 2014.

15.     Nevertheless, PPL has threatened to disrupt all existing services it now provides Core unless Core immediately pays all disputed amounts.

16.     Furthermore, PPL refuses to engage in AAA arbitration of disputed amounts prior to going through with its threatened service disruption.

## COUNT I (DECLARATORY RELIEF)

16.     Core incorporates the preceding paragraphs as if stated fully herein.

17.     The Parties have genuine disputes regarding their rights and responsibilities under the MSA.

18.     Core requires this Court to enter a judgment for declaratory relief regarding the parties' rights and responsibilities under the MSA.

## COUNT II (BREACH OF CONTRACT)

19.     Core incorporates the preceding paragraphs as if stated fully herein.

20.     The MSA only permits PPL to bill Core for services which Core ordered and PPL actually provided.

21.     PPL breached the MSA by billing for services which PPL never rendered.

22.     PPL breached the MSA by continuing to bill Core for services after Core cancelled those services.

23.     PPL breached the MSA by refusing to issue appropriate service credits to Core, and by asserting an inaccurate balance due from Core.

24.     PPL breached the MSA by reconfiguring agreed-upon physically redundant services with lesser-grade non-redundant services, without ever notifying Core, or negotiating a lesser rate.

24.     PPL breached the MSA by refusing to submit to binding arbitration before AAA to resolve Core's disputes, and instead "resolved" those disputes unilaterally.

24.     As a result of PPL's breaches of the MSA, CoreTel has been damaged.

25.     The amount of the damages caused to CoreTel by the PPL's breaches exceeds $75,000.

## COUNT III (INJUNCTIVE RELIEF)

25.     Core incorporates the preceding paragraphs as if stated fully herein.

26.     If PPL is permitted to proceed with its threatened suspension of services, Core will be unable to operate and compete in multiple service areas in Maryland, Pennsylvania and Virginia, including Chevy Chase, MD, Altoona, PA, Harrisburg, PA, Wilkes-Barre, PA, Clarksburg, WV and Charleston, WV.

27.     If PPL is permitted to proceed with its threatened suspension of services, Core's ability to operate in these markets in the future will be irreparably damaged.

41.     Core cannot cure this impending harm by simply paying PPL's immediate demand for $180,666.93 because payment of this sum, which is not due, would cripple Core's ability to continue operations in all of its markets.

42.     CoreTel simply does not have sufficient funds to pay PPL's inflated demands.

43.     PPL's threat to disrupt services is especially egregious in light of the fact that it has knowingly refused to process Core's service credit requests, and continues to bill Core at an inflated rate on each new monthly invoice, all the while continuing to amass and increase an inflated and unsubstantiated balance due.

44.     PPL will suffer no harm if an injunction is issued preventing it from implementing its threat to disrupt services. To the extent Core owes the PPL any undisputed amount for services rendered, that amount is much less than what PPL is demanding, and Core has offered to pay that amount immediately, on the condition that PPL engage in AAA arbitration to resolve the outstanding disputes, as required by the MSA.

45.     The public interest also demands an injunction.  Permitting PPL to leverage its unwarranted demand for payment so as to suspend services and halt Core's provision of services to its customers will have negative implications for consumers. CoreTel's network services multiple local, regional and national Internet Service Providers ("ISPs") and voice-over-Internet protocol ("VOIP") providers in Maryland, Pennsylvania and Virginia. Approximately 15,610 individual dial-up end-users access their ISP each day within the portions of Core's network which would be impacted by PPL's threatened service disruption. In addition, CoreTel has assigned, through its VOIP provider customers, 77,207 telephone numbers, which are used by individuals and business to access voice and fax services in the portions of Core's network which would be impacted by PPL's threatened service disruption. PPL's threatened disconnection will

force these CoreTel customers, and their end users, to seek alternative, less attractive, suppliers and offerings. Disconnection will also have an immediate impact on the availability of dial-up service to consumers, some of whom may not be able to reach their dial-up provider of choice, since CoreTel is one of the few remaining CLECs that offer service to ISPs.

## RELIEF REQUESTED

67.      WHEREFORE, Core prays the following relief:

A.      That the Court declare the Parties' respective rights and obligations with respect to the MSA, or stay this proceeding while these matters are resolved through AAA arbitration.

B.      That the Court determine the damages caused to CoreTel by the PPL's breaches of the MSA, or stay this proceeding while these matters are resolved through AAA arbitration.; and

C.      That the Court enjoin PPL from suspending any services pending resolution of Core's disputes before AAA; and

D.      Grant such other relief as justice may require.

WHEREFORE, CoreTel prays for a temporary, preliminary, and permanent injunction barring PPL's improper disruption of services and to grant other relief this Honorable Court deems is just and proper.

Respectfully submitted,

OFFIT KURMAN

/s/ Meghan K. Finnerty
Meghan Finnerty
Offit Kurman
Ten Penn Center
1801 Market Street, Suite 2300
Philadelphia, PA 19103
(267)338-1322
mfinnerty@offitkurman.com

CORE COMMUNICATIONS, INC.

*s/Christopher F. Van de Verg*
Christopher F. Van de Verg (*Pro Hac Vice*)
General Counsel
Core Communications, Inc.
209 West Street
Suite 302
Annapolis, MD 21401
Tel. (410) 216-9865
chris@coretel.net

*Attorneys for Core Communications, Inc.*

Filed:   February 21, 2014

4838-9277-5960, v. 1



# PPL TELCOM, LLC
# MASTER SERVICE AGREEMENT

This MASTER SERVICES AGREEMENT (the "MSA") is made by **PPL TELCOM, LLC,** a Delaware limited liability company with its principal office at Two North Ninth Street, Allentown, PA 18101, ("PPLT") and _____, with its principal office at _____, ("CUSTOMER"), effective as of the date of last execution (the "Effective Date"). PPLT and CUSTOMER agree that the following Terms and Conditions apply to the provision and use of the products and services referenced herein and in any Supplements and Service Orders. Either PPLT or CUSTOMER may be referred to herein individually as a "Party'" or, collectively, as the "Parties."

## SECTION 1. GENERAL PROVISIONS

**1.1    Definitions.**    Capitalized terms used herein but not otherwise defined will have the following meanings:

**Affiliate(s):**  With respect to either Party any entity controlled by, in control of, or under common control with such Party.

**Commitment:**    A commitment for Service that obligates CUSTOMER to pay for a minimum revenue or volume of Service and commences upon billing, unless otherwise specified.

**Confidential Information:**  Non-public information regarding the business of a Party where such information is marked or otherwise communicated as being "proprietary" or "confidential", or where such information is, by its nature, confidential.

**Premises:**  The location(s) specified in the Service Order to or from which Services will be delivered.

**Service:**  Any service(s) offered by PPLT pursuant to a Service Order.

**Service Order:**  A request for PPLT Service on a form provided by PPLT and executed by the Parties.

**Supplement:**  An attachment to the MSA that defines the terms and conditions of the Service to be ordered.

**Termination Charges:**  The standard Termination Charges of PPLT which will apply for cancellation of a Service Order by either Party prior to expiration of the term on the Service Order. Termination Charges will also apply for termination of the MSA prior to expiration of the Term on the MSA.

## SECTION 2. CUSTOMER SERVICE ORDERS

**1.2    Service Order Requests**.  CUSTOMER will submit to PPLT signed Service Order forms requesting the provision of Service. PPLT will confirm the accuracy of information on the Service Order form and the availability of the Service requested and return the Service Order form countersigned by an authorized officer of PPLT constituting PPLT'S acceptance; provided, however, PPLT will have no obligation to accept such Service Orders. PPLT must receive all applicable deposits, including any Security Deposit, fees and charges before processing of any Service Order.

## SECTION 3. BILLING AND PAYMENT

**3.1    Invoices.**  Unless otherwise indicated in the applicable Service Order, PPLT will bill in advance charges for all Service to be provided during the ensuing month except for charges which are dependent upon usage of Service, which charges will be billed in

arrears.  PPLT will invoice CUSTOMER for all charges incurred by and credits due to CUSTOMER as set forth in the Service Order describing the specific Services ordered.  Adjustments for the quantities of Service established or discontinued in any billing period during the Term will be pro-rated to the number of days based on a thirty (30) day month, if applicable.

**3.2    Taxes; Other Charges.**  Except for taxes or impositions based on PPLT'S net income and except with respect to ad valorem personal and real property taxes imposed on PPLT'S property, CUSTOMER shall be solely responsible for payment of all sales, use, property, gross receipts, excise, access, bypass, franchise, value added, communications, or other local, state and federal taxes, fees, charges, or surcharges, however designated, imposed by any domestic or international government entity on or based upon the provision, sale or use of Service delivered by PPLT, with applicable taxes computed and collected by PPLT.  PPLT reserves the right to pass or to Customer any tax levy or surcharge that PPLT is obligated to pay to any governmental entity or third party where (a) such obligation is imposed by valid or lawful legislation or regulation and (b) such obligation arises out of the provision or use of the Service under this Agreement. Service shall not be subject to taxes for a given jurisdiction if Customer provides PPLT with written verification, acceptable to PPLT and to the relevant taxing jurisdiction, that Customer has been granted a tax exemption. Service shall also not be subject to contribution to any universal service program if Customer provides PPLT with written verification, acceptable to PPLT for the relevant jurisdiction, that the Service will be resold by Customer and that the revenues from such resale shall be subject to the universal service program's contribution requirements,

**3.3    Payment Terms.**  Invoices for Services are due and payable in U.S. dollars within thirty (30) days of the invoice date unless otherwise indicated in the applicable Service Order. Payments not received within thirty (30) days of the invoice date are considered past due. In addition to PPLT undertaking any of the actions set forth in this Agreement, if any invoice is not paid when due, PPLT may: (i) apply a late charge equal to 1-1/2% (or the maximum legal rate, if less) of the unpaid balance per month; (ii) require an additional Security Deposit or other form of security; and/or (iii) take any legal action in connection with any other right or remedy PPLT may have under this Agreement or at law or in equity.

**3.4    Invoice Questions.**  If CUSTOMER in good faith disputes any portion of any PPLT invoice, CUSTOMER will submit to PPLT, within thirty (30) days following the invoice date, full payment of the undisputed portion of the invoice and written documentation identifying and substantiating the disputed amount. If CUSTOMER does not report a dispute within thirty (30) days following the invoice date, CUSTOMER will have waived its right to dispute that invoice. PPLT and CUSTOMER agree to use their respective best efforts to resolve any dispute within thirty (30) days after PPLT receives written notice of the dispute from CUSTOMER. Any disputed amounts resolved in favor of CUSTOMER will be credited to CUSTOMER'S account on the next invoice following resolution of the dispute. Any disputed amounts determined to be payable to PPLT will be due within ten (10) days of the resolution of the dispute. Any dispute arising out of or relating to this

Cust ID _____

*Proprietary & Confidential*

Master Svc Agrmt
Revision 05/03/2002
Page 1 of 4

MSA No._____

Agreement, which has not been resolved by the good faith efforts of the parties, will be settled by binding arbitration conducted in accordance with this Agreement.

**3.5    Conditions Precedent Credit Approval.**  CUSTOMER will provide PPLT with credit information as requested prior to the Effective Date of each Service Order. PPLT may, in its reasonable discretion, require CUSTOMER to provide a deposit:

a)    As a condition to PPLT'S execution of this MSA or any Service Order,

b)    As a condition to PPLT'S continuation of Service under any Service Order, but only when CUSTOMER'S consumption of Service materially exceeds CUSTOMER'S anticipated use,

c)    When such deposit is required in order to secure CUSTOMER'S anticipated use, or

d)    When such deposit is required in order to secure CUSTOMER'S continued payment obligation, which deposit will be held by PPLT as security for payment of charges.

e)    At such time as the provision of Service to CUSTOMER ceases, the deposit may be credited to CUSTOMER'S account and any remaining credit balance may be refunded, if all terms and conditions for Service have been met.

f)    If at any time during the term of this Agreement there is a material and adverse change in CUSTOMER'S financial condition or payment history, which will be determined by PPLT in its sole and absolute discretion, then PPLT may demand that CUSTOMER deposit with PPLT a security deposit or increase the amount of deposit (the "Security Deposit"), as the case may be, pursuant to PPLT'S standard Terms and Conditions, as security for the full and faithful performance of CUSTOMER of the terms, conditions, and covenants of this Agreement.

## SECTION 4.  DEFAULT AND TERMINATION

**4.1    Events of Default.**  An event of "default" will occur if a CUSTOMER fails to make payment as required under this Agreement and such failure remains uncorrected for five (5) days after written notice from PPLT; or (b) either Party fails to perform or observe any material term or obligation (other than making payment) contained in this Agreement, and any such failure remains uncorrected for thirty (30) days after written notice from the non-defaulting Party informing the defaulting Party of such failure. Notwithstanding the foregoing, CUSTOMER will submit to PPLT, within thirty (30) days following the invoice date, full payment of the undisputed portion of the invoice. If CUSTOMER uses the Services for any unlawful purpose or in any unlawful manner, PPLT will have the right to immediately suspend and/or terminate any or all Services hereunder without notice to CUSTOMER.

In the event of a CUSTOMER default for any reason, PPLT may: (i) suspend Services to CUSTOMER; (ii) cease accepting or processing orders for Services; and/or (iii) terminate this Agreement. If this Agreement is terminated due to a CUSTOMER default, such termination will not affect or reduce CUSTOMER'S minimum monthly commitments required under this Agreement, if applicable, and all Termination Charges penalties will apply. CUSTOMER agrees to pay PPLT'S reasonable expenses (including attorney and collection agency fees) incurred in enforcing PPLT'S rights in the event of a CUSTOMER Default.

In the event of a PPLT default, CUSTOMER may terminate this Agreement without penalty. CUSTOMER will, however, remain liable for all charges incurred for Services provided prior to CUSTOMER'S termination of this Agreement.

**4.2    Effect of Cancellation/Termination.**  PPLT may, in addition to all other remedies available to PPLT at law or in equity, assess and collect from CUSTOMER Termination Charges, including retention of any deposits or fees held:

a)    Upon cancellation of a Service Order by either Party prior to expiration of the term on the Service Order, whether pre or post delivery of Service, or

b)    Upon termination of the MSA, whether pre or post delivery of Service by PPLT.

**4.3    Termination Charges.**  For purposes of calculating liability upon termination of this MSA or any Service Order, Termination Charges will consist of:

a)    All charges incurred by PPLT to deliver and/or terminate Service, whether internal or external,

b)    All charges due through the end of the applicable term of the Service Order.

c)    PPLT will have the sole and absolute discretion to restore Service only after satisfaction of such conditions as PPLT determines to be required for its protection. Nonrecurring charges will be applied to restoration of Service.

**4.4    Bankruptcy.**  In the event of bankruptcy or insolvency of either Party or if either Party will make any assignment for the benefit of creditors or take advantage of any act or law for relief of debtors, the other Party to this Agreement will have the right to terminate this Agreement without further obligation or liability on its part.

## SECTION 5. SERVICES AND FACILITIES

**5.1    PPLT Facilities.**  CUSTOMER will not and will not permit others to rearrange, disconnect, remove, and attempt to repair, or otherwise tamper with any of the facilities or equipment installed by PPLT, except upon the written consent of PPLT. Equipment provided or installed by PPLT for use in connection with the Service will not be used for any purpose other than that for which PPLT provided it. In the event that CUSTOMER or a third party attempts to operate or maintain any PPLT equipment without first obtaining PPLT'S written approval, in addition to any other remedies of PPLT for breach by CUSTOMER of CUSTOMER'S obligations hereunder, CUSTOMER will pay PPLT upon invoice for any damage to PPLT equipment and service charges in the event that maintenance or inspection of the equipment is required as a result of CUSTOMER'S breach of this subsection. In no event will PPLT be liable to CUSTOMER or any other person for interruption of Service or for any other loss, cost or damage caused or related to improper use or maintenance of PPLT equipment.

In the event PPLT determines that it is necessary to interrupt Services or that there is a potential for Services to be interrupted for the performance of system maintenance, PPLT will provide at least three (3) days prior written notice. In the event of an unscheduled emergency situation PPLT will use good faith efforts to notify CUSTOMER prior to the performance of such emergency maintenance. PPLT will schedule non-emergency maintenance during non-peak hours (midnight to 6:00 a.m. local time). In no event will interruption for system maintenance constitute a failure of performance by PPLT, provided such maintenance is performed within a reasonable time according to industry standards.

**5.2    Customer Facilities.**  PPLT will not be responsible for the operation or maintenance of any Customer-provided communications equipment, if any.  PPLT will not be responsible for the transmission or reception of signals by Customer-provided equipment or for the quality of, or defects in, such transmission. Customer represents and warrants that it is certified to do business

Cust ID _____

MSA No._____

*Proprietary & Confidential*

Master Svc Agrmt
Revision 05/03/2002
Page 2 of 4

in all jurisdictions in which it conducts business and is in good standing in all such jurisdictions.

## SECTION 6.    OBLIGATIONS AND LIABILITY LIMITATION

**6.1    Obligations of the Customer.**    CUSTOMER will be responsible for all of the following:

a)    Payment of all charges applicable to the Service (including charges incurred as a result of fraud or unauthorized use of the Service), and

b)    Providing access to the Premises where service is to be provided, if applicable.

**6.2    Limitations of Liability.**    The liability of PPLT for damages, if any, arising out of the furnishing of Service, including but not limited to mistakes, omissions, interruptions, delays, tortious conduct or errors, or other defects, representations, use of Service or arising out of the failure to furnish Service, whether caused by acts of commission or omission, will be limited to the extension of credit allowances. The extension of such credit allowances will be the sole remedy of CUSTOMER and the sole liability of PPLT. NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOST PROFITS OR LOST REVENUES), WHETHER OR NOT CAUSED BY THE ACTS OR OMISSIONS OR NEGLIGENCE OF ITS EMPLOYEES OR AGENTS, AND REGARDLESS OF WHETHER SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.

**6.3    Disclaimer of Warranties.**    PPLT MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR USE, EXCEPT THOSE EXPRESSLY SET FORTH HEREIN.

## SECTION 7.  CONFIDENTIALITY

**7.1    Confidential Information, Non-disclosure.**    The Confidential Information disclosed by either Party constitutes the confidential and proprietary information of the disclosing Party and the receiving Party will retain same in strict confidence and not disclose to any third Party except as authorized by this MSA without the disclosing Party's express written consent, and as more specifically set forth in the nondisclosure agreement executed by the Parties, which will continue in effect throughout the Term of the MSA. Notwithstanding anything to the contrary, PPLT may provide confidential information regarding this MSA to the Pennsylvania PUC or to any federal, state or local government agency with responsibility for land over, under or through which any optical fibers used to provide Service is located.

**7.2    Publicity.**    This MSA will not be construed as granting to either Party any right to use any of the other Party's or its Affiliates' trademarks, service marks or trade names or otherwise refer to the other Party in any marketing, promotional or advertising materials or activities. Without limiting the generality of the foregoing, neither Party will issue any publication or press release relating to, or otherwise disclose the existence of, any contractual relationship between PPLT and CUSTOMER, without the written consent of the other Party.

## SECTION 8.  MISCELLANEOUS

**8.1    Force Majeure.**    Except with respect to payment of monies due hereunder, neither Party will be liable for any failure of

performance hereunder due to causes beyond its reasonable control including, but not limited to:  acts of God, fire, explosion, vandalism, cable cut, flood, storm, or other similar catastrophe; any law, order, regulation, direction, action or request of the United States government or of any other government, including state and local governments having jurisdiction over either of the parties, or of any department, agency, commission, court, bureau, corporation or other instrumentality of any one or more of said governments, or of any civil or military authority; national emergencies; insurrections, riots, wars, or strikes, lock outs, or work stoppages.

**8.2    Assignability.**    Neither Party may assign this Agreement without the express written consent of the other Party, which consent will not be unreasonably withheld, and then only when such transfer or assignment can be accomplished without interruption of the use or location of Service. Notwithstanding the foregoing: (i) a security interest in this Agreement may be granted by PPLT to any lender to secure borrowings by PPLT or any of its Affiliates; (ii) either Party may assign all its rights and obligations hereunder to any Affiliate; (iii) either Party may assign all its rights and obligations hereunder in the event of a merger or sale of substantially all of such Party's assets.

**8.3    Notices.**    All notices and other communications will be in writing and will be deemed to have been given as of the date of delivery or confirmed facsimile transmission. If mailed, notice will be sent first class postage prepaid, certified or registered mail, return receipt requested and becomes effective upon confirmed delivery. Notices will be delivered or sent to the parties' respective addresses first listed above to the attention of the person signing this agreement and at the addresses indicated on the signature page hereto.

**8.4    Indemnification Obligations.**

a)    Each Party will indemnify, defend, release, and hold harmless the other Party, its Affiliates, directors, members, officers, employees, workers, and agents from and against any action, claim, cost, damage, demand, loss, penalty, or expense including but not limited to reasonable attorneys' fees, and costs (collectively "Claims") imposed upon either Party by reason of damages to property or personal injuries, including death, as a result of an intentional or negligent act or omission on the part of the indemnifying Party in connection with the performance of this Agreement or other activities relating to the Service, the property, or the facilities which are the subject of this Agreement.

b)    With respect to third parties that use the Service provided hereunder, CUSTOMER will indemnify, defend, release and hold harmless PPLT against any claims by such third parties for damages arising out of or resulting from any defect, interruption or failure to provide any Service.

c)    CUSTOMER will indemnify, defend, release and hold harmless PPLT against any court, administrative, or agency action or suit, whether criminal or civil, public or private brought against PPLT arising out of or related to the contents transmitted hereunder, including but not limited to claims with respect to any violation of copyright law, export control laws, failure to meet government or technical standards or that such transmissions are libelous, slanderous or otherwise are unauthorized or illegal.

d)    In the event any action will be brought against the indemnified Party, such Party will immediately notify the indemnifying Party in writing, and the indemnifying Party, upon the request of the indemnified Party, will assume the cost of the defense thereof on behalf of the indemnified Party and its Affiliates and will pay all expenses and satisfy all judgments which may be incurred by or rendered against the indemnified Party or its Affiliates in connection therewith, provided that the indemnified Party will not be liable for any settlement of any such action effected without its written consent.

Cust ID _____

MSA No._____

*Proprietary & Confidential*

Master Svc Agrmt
Revision 05/03/2002
Page 3 of 4

**Tab A--MSA**

e)   This section will survive termination of this Agreement, regardless of the reason for termination.

**8.5    Term.**  This Agreement will become effective on the Effective Date and will continue for sixty (60) months (the "Initial Term"). The Parties' rights and obligations, which by their nature would extend beyond the termination, cancellation or expiration of this Agreement, will survive such termination, cancellation or expiration. In any event, the Terms and Conditions of this Agreement will continue to apply to any order for Services that have a stated term that extends beyond the Initial Term of this Agreement. This Agreement will automatically renew on a month-to-month basis following the expiration of the Initial Term and remain in effect thereafter until terminated by either Party upon no less than sixty (60) days prior written notice. The Initial Term and any renewal periods will collectively be referred to as the "Term."

**8.6    Entire Understanding.**    This MSA, including any Supplements or Service Orders executed hereunder (and any tariff applicable to the delivery of Service), and any separate non-disclosure or confidentiality agreement expended by the Parties constitute the entire understanding of the Parties related to the subject matter hereof and supersedes all prior information provided CUSTOMER, whether oral or in writing. In the event of any conflict between the provisions of these Terms and Conditions and the applicable Service Order and Exhibits, the conflict will be resolved by reference to the following order of priority of interpretation: a) Service Order; b) Exhibits; and c) Terms and Conditions; however, no Exhibit requiring execution will be binding unless and until such Exhibit has been fully executed by an authorized officer, agent, or representative of each Party.

**8.7    Regulatory and Legal Changes.**  PPLT may elect or be required by law to file with the appropriate regulatory agency tariffs respecting the delivery of certain Service.  In the event and to the extent that such tariffs have been or are filed respecting Service ordered by CUSTOMER, the terms set forth in the applicable tariff will govern PPLT'S delivery of, and CUSTOMER'S consumption or use of, such Service.

**8.8    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and when taken together will constitute one document.  The parties expressly authorize the use of a facsimile counterpart as a valid method of execution for CUSTOMER; however, for valid execution by PPLT, PPLT'S original signature will be required. In the event that CUSTOMER executes this Agreement via facsimile

counterpart, CUSTOMER agrees to provide PPLT with a fully executed original of this Agreement within five (5) days of such facsimile counterpart execution.

**8.9    No Waiver.**  No failure by either Party to enforce any rights hereunder will constitute a waiver of such right, unless otherwise specifically set forth herein.

**8.10    Dispute Resolution.**    Any dispute which the Parties are unable to resolve within thirty (30) days written notice to the defaulting Party will be submitted to the American Arbitration Association for binding arbitration pursuant to the Commercial Arbitration Rules with proceedings conducted in Philadelphia, Pennsylvania.  Notwithstanding any other section of this MSA the non-breaching Party will be entitled to seek preliminary relief to preserve the status quo pending arbitration.  Nothing stated herein will be construed to limit any other remedies available to the Parties. The arbitrator will have the power to order specific performance if requested. Any award, order, or judgment pursuant to such arbitration will be deemed final and binding and may be enforced in any court of competent jurisdiction. The Parties agree that the arbitrator will have no power or authority to make awards or issue orders of any kind except as expressly permitted by this Agreement, and in no event will the arbitrator have the authority to make any award that provides for punitive or exemplary damages. All such arbitration proceedings will be conducted on a confidential basis. The arbitrator may, as part of the arbitration award, permit the substantially prevailing Party to recover all or part of its attorneys' fees and other out-of-pocket costs incurred in connection with such arbitration.

**8.11    Business Relationship.**  This Agreement will not create any agency, employment, joint venture, partnership, representation, or fiduciary relationship between the parties.  Neither Party will have the authority to, nor will any Party attempt to, create any obligation on behalf of the other Party.

**8.12    Amendments/Modifications.**     This Agreement may only be amended, modified or supplemented by an instrument in writing executed by each Party.

**8.13    Governing Law.**     This MSA will be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its principles of choice of law.

The undersigned Parties have caused this Master Services Agreement to be executed by their duly authorized representatives.

| ("CUSTOMER")_____ | PPL TELCOM, LLC ("PPLT") |
|---|---|
| Signature _____ | Signature _____ |
| Name _____ | Name _____ |
| Title _____ | Title _____ |
| Date _____ | Date _____ |

# Tab B--Dispute Summary & Detail

Zayo

| Invoice Service | Alternate | Circuit ID | Legacy Circuit ID | Type | A Loc | Z Loc | Basis | Notes | Billing Start Date | Billing End Date | Billing Rate | accept date | disconnect/downgrad | number of months | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 300699 | 300699 HIYX/059375//ZYO | | DS3 Tail | 301 Chestnut St. | 921 Market St | Circuit was not | | 9/1/2012 | current | 1238.33 | 6/13/2013 | | 9.50 | $11,764.14 |
| | 300665 | 300665 HIYX/059514//ZYO | | DS3 Tail | 301 Chestnut St. | 105 Newmann Ave | Circuit was not | | 7/23/2012 | current | 1238.33 | 10/27/2013 | | 15.37 | $19,029.00 |
| | 179182 | 300570 HIYX/044251//ZYO | | DS3 P2P | 4533 Stanford St, | 21715 Filigree Ct, 1st | Disconnect Date | | 5/1/2012 | current | 1275.53 | 5/7/2013 | | 9.63 | $12,287.61 |
| | 300572 | | FEYX/059056//ZYO | | Eline 300M | ALOC - | ZLOC - ASBN/VACY | Check Start Date | | 8/27/2012 | current | 2367.38 | | 5/7/2013 | 8.43 | $19,964.90 |
| | 2222 | 300580 GEUL/019100//ZYO | G06000004684 | Eline 600M | ASBN | Charles St Baltimore, | Never Downgrade & | should have been downgraded at | 4/1/2012 - oldest | 11/30/2013 | 3288.02 | | 6/20/2012 | 17.60 | $22,784.26 |
| | | | | | | | | | | | 920.64 | | | | |
| | | | | | | | | | | | | | Total | | $85,829.91 |

| CoreTel RT ticket | | 300579 FEYX/58467//ZYO | | Eline 300M | 301 Chestnut Street | 900 Race Street / | Zayo fiber cut | Outage started on 06/18/2013 at | | | $1,632.27 | | | | |

Tab B--Dispute Summary & Detail

# Turn up and Test Zayo OC12HUB to DS3
# Harrisonburg, VA

## Circuit Details:

A-Loc Address:                    Z-Loc Address:
301 Chestnut St.                   105 Newmann Avenue
Harrisburg, PA 17101               Harrisonburg, VA

Zayo NOC:                          800-990-9679
Zayo Service Order:                300665
Zayo Circuit ID:                   HIYX/059514//ZYO
Zayo OC12 STS Channel:             9
Zayo Test/Turnup Ticket:           317147

CoreTel APX:                       hrbg-apx02
CoreTel Slot/Channel:              19

## Test/turnup Notes:

**[ZAYO]**
2013-10-07 - 9:00AM - Called Zayo to loop test circuit - ticket # 317147.

**[ZAYO]**
2013-10-07 - 10:00AM - Received callback from Dean in their sonet group.  Dean gave me a
loop at the Z-loc (Harrisonburg, VA) right where they hand off to Verizon.  I saw that loop up and
clean no errors.  Dean dropped the loop and circuit went into red alarm.  Dean confirmed he
also saw red alarm / loss of signal coming from Verizon at the handoff.   Circuit looped clean
through Zayo's network waiting for Verizon to complete circuit to complete DS3 turn-up.

**~KATHY [Verizon-Harold]** 2013-10-07 - 14:45 - Called to test with Harold, No Remote Access,
so he needed to open a ticket (PT346816) for direct CO tech testing, Verizon-Steve, CO Tech
said circuit was completed on 10/2 on 6002/T3S/06/HRBGVAXA/HRBGVAXAHGA.  This should
have been built on ch 03.  All our paperwork (including Vz) says ch 03.  Steve refused to move it
without a change order.

**[CORETEL-KATHY]**
2013-10-28 - 1:00PM - Kathy (CoreTel) notified me that we may be seeing a loop on DS3 to
Harrisonburg, VA (Zayo CID: HIYX/059514//ZYO and VZ 4001B).  Verizon dropped the DS3 and
we are still seeing it in up state (no alarms).  Checked HRBG Ciena and showing I have no

**Tab B--Dispute Summary & Detail**

active loops which means circuit is up or there is a loop past our Ciena.

**[ZAYO]**
2013-10-28 - 1:55PM - s/w John @ Zayo - he said we need a new test/turnup ticket and engage install team.  New ticket # 333790.

**[CORETEL-RICH]**
2013-10-29 - 10:00AM - Have not received any calls or voicemails from Zayo regarding ticket 333790.  Calling for update.

**[ZAYO]**
2013-10-29 - 10:05AM s/w Dean - he is looking at it in harrisonburg VA (towards verizon).   He dropped the circuit on the Z-loc (Harrisonburg, VA) and I did NOT see the circuit go down (hrbg-apx02 slot 19).   He is now checking on the HRBG PA side.   He also confirmed this circuit is STS channel 9 on the OC12.  Dean broke the circuit on the HRBG PA side, and finally I saw it go into AIS alarm:

```
t3-1/19> ds3link -a
[1] Loss of Signal:           false
[1] Out of Frame:             false
[1] Alarm Indication Signal:  TRUE
[1] Idle Signal:              false
[1] Yellow Signal:            false
[1] In Red Alarm:             false
[1] C-bit parity framing:     false
```

- Dean is troubleshooting why I did not see circuit go down when he broke it further down the line (towards Z-loc).

- He deleted the xconnect where they hand off in Virginia and I still show circuit up.

- Dean believes there may be a mystery loop on this circuit.

- Dean has dropped the circuit at 2 diff Zayo MUX's in PA and I saw our DS3 go into AIS alarm each time.   He then tries to drop the circuit in VA (farther towards the Z-loc) and I do NOT see it drop.

- He started looking into the provisioning of the circuit.  He doesnt know what the hell their designer was thinking.  Was originally built as 1+1 UPSR ring it was looping around the ring and coming back to us on HRBG PA side. He deleted the xconnect re-added it on the WORKING side.  Seems this circuit may have issue on the PROTECT side (within their redundancy ring).

- Dean is going to get with his designer and get this fixed on the PROTECT side of ring then call me back.  In meantime this DS3 is up to Verizon on the WORKING side he said we may see it

**Tab B--Dispute Summary & Detail**

drop once or twice today as its fully fixed.


**[ZAYO]**

2013-10-29 - 3:58PM - Received voicemail from Dean.  He said he spoke to the circuit design person and they need to take this DS3 down to make the appropriate provisioning changes.  I called and left him a voicemail telling him go ahead do it and to let me know when it is done.

**[ZAYO]**

2013-10-29 - 5:14PM - Received call from Dean @ Zayo.  He said they are finished making changes to the protect side of this circuit and we should not see it drop any more as its correctly built now.   Notified him we will be testing with Verizon soon.   He said he is there for another 2 hours in case we need him and he will put this ticket on 24 hour auto close.

**[ZAYO]**

2013-10-30 - 9:55AM - Received call from Dean @ Zayo.  He wanted to know if we made any progress with VZ yet.   Told him we have reached out to them for testing but VZ has not responded yet.   He said he will put the ticket on a 24 hour auto-close and if we need him we can call him directly @ 720-549-2269.

# Turn up and Test Frontier (via Zayo) DS3's
# Parkersburg, WV

**Circuit #2 Details**:

A-Loc Address:                     Z-Loc Address:
301 Chestnut St.                   921 Market St
Harrisburg, PA 17101               Parkersburg, WV

Zayo NOC:                          800-990-9679
Zayo Service Order:                300699
Zayo Circuit ID:                   HIYX/059375//ZYO
Zayo OC12 STS Channel:             8
Zayo Test/Turnup Ticket:           241488

CoreTel APX:                       hrbg-apx02
CoreTel Slot/Channel:              21

**Summary:**

We ran into trouble on the Zayo side with SO 300669 (HIYX/059375) due to this circuit being built through Zayo's transport network across a fiber path in New York which was never fully turned up.   This caused the service order to get referred back to Zayo's design team to completely re-design the circuit.

**Testing Notes:**

**[ZAYO]**
2013-05-30 - 2:50PM - s/w Vicki - she confirmed the STS channels of the above Zayo circuits:

SO 300666 : STS 6
SO 300699 : STS 8

**[ZAYO]**
2013-05-30 - 4:00PM - Called Zayo to attempt to loop test both DS3's s/w Josh - opened two turn-up/test tickets on the above circuits (SO 300666 = ticket 241485, and SO 300699 = ticket 241488).   Waiting for Zayo to call back to attempt to get loop from Z-loc towards A-loc.

**[ZAYO]**

**Tab B--Dispute Summary & Detail**

2013-05-30 - 4:50PM - Received call from Caleb to perform loop testing from Z-loc > A-loc on the above two DS3's.  He said the first DS3 (HIYX/059336) was set to OOS - he turned it INS and my alarm cleared.

**[ZAYO]**
2013-06-07 - 11:13AM - Called Zayo to let them know they have a loop somewhere on HIYX/059375//ZYO and to re-open test turnup ticket 241488.

**Zayo Test/Turnup Ticket:              241488**

Frontier's tech in Parksberg, WV sees a blue alarm coming in from Zayo.   Zayo must have a loop on the circuit somewhere.  When I look at circuit from A-side (HRBG) I see DS3 is up and normal would appear circuit is up or I am looking at a loop.

She said that the ticket is still Open and "Caleb" is the one who has worked on it.  She is going to talk to him and have him call me back.

**[ZAYO]**
2013-06-10 - 9:05AM - Called Zayo for update s/w Brian.  He is going to transfer me to someone in optical group to work with on this.

**[ZAYO]**
**2013-06-10 - 9:15AM - S/w Scotty - He is getting in that fiber node at Z-loc.  He is seeing the ds3 is cut through live INS.   He broke the circuit at the A-loc (HRBG Zayo MUX) and I saw AIS-P alarm (path unequipped).   He gave me a loop farther down towards the Z-loc (on the outskirts of Parkersburg, WV) and I still saw circuit UP.   He said I should have seen circuit drop but I did not and this narrows it down to problem in Zayo network before Parkersburg, WV.  Circuit does not appear to be built based on the Z-loc we have requested otherwise I should have seen circuit drop when he dropped that loop.**

Scotty  918-295-7105

**[ZAYO]**
2013-06-10 - 11:20am - called for update s/w Mike he pulled up ticket showed Scotty was working on it transferring me to him for udpate.  He said he has kicked that ticket back to their install dept (Caleb).  He is seeing 1 path that is unequipped out between New York and Charleston, WV.  He said it looks like it was part of an OC-192 turnup (the STS12C thats also on that path is also in unequipped state). He said I can call Caleb back for update using 800 , opt 2, opt 1, opt 2.

**[ZAYO]**
2013-06-10 - 12:45pm - Called for update s/w Sam - she is trying to get Caleb for me.  She left a voicemail for Caleb to call me back.

**Tab B--Dispute Summary & Detail**

**[ZAYO]**

2013-06-11 - 12:45PM - Called for update s/w - Can not reach anyone at their NOC extension (1) and also their install group rings 8 times then x-fers to NOC and still no one picks up.   Hit 0 to leave a message and it drops me to s busy signal.  Will try them again in few minutes.

**[ZAYO]**

2013-06-11 - 2:12PM - Called for update s/w Terry - she said the install group are all on their phones.  Stressed to her this circuit is past due date and we are trying to turn up with Frontier and we need this circuit built or fixed.  She is sending an email to install/design group for one of them to call me back ASAP on this.

**[ZAYO]**

2013-06-11 - 3:38PM - Received voicemail from Caleb @ 918-295-7039 - returning his call.

**[ZAYO]**

2013-06-11 - 3:55PM - Called Caleb back - left voicemail.

**[ZAYO]**

2013-06-12 - 9:30AM - Called Caleb left voicemail.

**[ZAYO]**

2013-06-12 - 10:15AM - Caleb called me back.  He has the ticket info up in front of him explained to him what was going on and he is going to look at the legs of the circuit near Z-loc due to previous zayo tech (Scotty) stating he saw it in unequipped state along with other circuits.  Caleb is actively working on this and will call me back when complete.

**[ZAYO]**

2013-06-13 - 10:00AM - Received call from Caleb.  He now has access to their NMS this morning.   He did not yesterday. Over past 2 days Zayo's IT group has been doing maintenance which has caused them to "lose visibility to their Northeast nodes".  He said they are finally done messing with it and he has node visibility.   He is going to try to give me a loop from Z-Loc.  Our Ciena NMS was not working had to re-load it calling Caleb back in 15 mins once its ready.

Caleb's secondary line:  918-295-7006
email:  caleb.pool@zayo.com

**[ZAYO]**

2013-06-13 - 10:30AM - On phone with Caleb he is providing me with loopbacks to determine where issue is.

**[ZAYO]**

**Tab B--Dispute Summary & Detail**

**2013-06-13 - 11:30AM - Caleb has gotten Zayo to remap the circuit via a different design. There was a problem between NY and Charleston, WV.  He got design to map circuit through different (working) path and circuit is now up to Frontier.  They are going to leave our ticket open for 24 hour auto close.**

**Tab B--Dispute Summary & Detail**

Rich Davies <rdavies@coretel.net>                                                       May 7, 2013  4:32 PM

To: kelly.smith@zayo.com
Cc: "glenn@coretel.net" <glenn@coretel.net>
Please start billing on new GIGE P2P circuit and please stop billing for DS3

---

Kelly,

I was told to contact you in regards to the following:

1.  We recently turned up a new GIGE P2P circuit via Zayo from Ashburn, VA to Chevy Chase, MD (Zayo CID:  FEYX/059056//ZYO ELINE).   The circuit is stable and we are currently using it therefore we accept the circuit and you can start billing for this.

2.  We would like to stop the billing for DS3 P2P circuit via Zayo from Ashburn, VA to Chevy Chase, MD (Zayo CID:  HIYX/044251//ZYO). We have already disabled the DS3 interface on our side and you should show no signal.  Please disconnect this circuit and stop the billing as soon as possible for this.


If there are any special forms or anything we need to fill out to pursue the above two items please let me know.


Thank you,

Rich

_____
Rich Davies
Core Communications
Network Manager
Phone: 570-814-2488
Email: rdavies@coretel.net

**Tab C--Zayo Demand Letter**



Core Communications Inc
Attn: Accounts Payable
209 West St, Ste 302
Annapolis, MD 21401

February 17, 2014

## URGENT ATTENTION REQUIRED
### Notice of Default and Potential Interruption of Service

Re:  Account Number – 1882

Your disputes have been reviewed and they are denied based on Section 3.4 of the governing contract between Zayo Group, LLC ("Zayo") and Core Communications Inc ("Core Communications"), dated December 14, 2004 ("Agreement"). All disputes must be filed within 30 days of invoice receipt, otherwise  such disputes are waived. In addition, all undisputed amounts must continue to be paid pursuant to the Agreement. Zayo hereby notifies Core Communications that its Account Number 1882 is more than thirty (30) days past due in the amount of $180,666.93 (the "Past Due Balance").  Accordingly, Core Communications failure to pay all outstanding amounts due according to the terms of the Agreement is a payment default under Section 4.1 of the Agreement.

Zayo hereby requests immediate payment of the full Past Due Balance within five (5) business days, or no later than February 24, 2014.  In the event that Zayo does not receive payment of the full Past Due Balance on or before February 24, 2014, your service will  be interrupted.  If your service is interrupted for a payment default, you may be assessed reconnect fees and/or be required to pay a deposit equal to two month's charges prior to reconnection. To prevent an interruption of service and to avoid additional charges, please submit your payment today via one of the following options:

1.      ACH Payments:
         Wells Fargo Bank, N.A.
         401 Linden St, Winston-Salem, NC 27150
         Routing #: 111015159
         Account Name: Zayo Group LLC
         Account #: 2000031004688

2.      WIRE payments:
         Wells Fargo Bank, N.A.
         401 Linden St, Winston-Salem, NC 27150
         ABA: 121000248
         SWIFT Code WFBIUS6S
         Account Name: Zayo Group LLC
         Account #: 2000031004688

Of course, if you have already made this payment, please disregard this notice and thank you for your payment.  If you have any questions, please feel free to contact us at (800) 390-6094 (3).

Sincerely,

Laurisa Bascom
AR Manager, Zayo Group, LLC

*Laurisa Bascom*

---

**ZAYO GROUP**
400 Centennial Parkway, Suite 200  |  Louisville, CO  |  80027
p.800.390.6094 | f.303.604.6869 | www.zayo.com

**Network Diagram for:** Core Communications **Tab D - SO2220-2223 Core Diagram**



**301 Chestnut**
Harrisburg, PA

CORE

GigE   GigE

PPLT   PPLT

**401 N Broad Street**
Switch & Data

PPLT   GigE   CORE

Core's Resp.

**21715 Filigree Ct.**
Ashburn, VA

CORE   GigE   PPLT
       GigE   PPLT

622M
SO#2223

622M
SO#2220

**401 N Broad Street**
4th Floor, Broadview

**401 N Broad Street**
4th Fr, CrossConnect
Solutions

PPLT   PPLT FIP   CORE
Gig E   Core's Resp.

622M
SO#2222

622M
SO# NEW
(replaces SO#2221)

**323 N Charles St**
Baltimore, MD

PPLT   PPLT
GigE   GigE
CORE

CoreTel's co-lo provider will pull and coil fiber inside the Broadview suite.

PPLT will terminate the fiber on a separate FIP provided by PPLT.

Access denied to customer and customer vendors. Initial installation to be coordinated with PPLT.

**LEGEND**

| | |
|---|---|
| New circuit | ▬▬▬ |
| cross-connects | ▬▬▬ |
| Interconnect | ▬▬▬ |
| Customer Responsibility | - - - - |

| PPLT SE: | David W. Ragone | Date | Rev | Engineer |
|---|---|---|---|---|
| | | 06-01-06 | 1 | dwr |
| **Illustration:** | | 06-01-06 | 2 | dwr |
| | | 06-09-06 | 3 | dwr |
| **Proprietary & Confidential** | | | | |
| *document rev 03-11-05* | | | | |

